[Nos. B008277, B008956. Second Dist., Div. Two. Sept. 4, 1985.]

Estate of ELEANOR M. BROWN, Deceased.
ELEANOR M. BROWN, Individually and as Administratrix, etc.,
Petitioner and Appellant, v.
GERALDINE NICHOLAS et al., Objectors and Respondents.

**COUNSEL**

Barbara R. Johnson for Petitioner and Appellant.

Mullen & Stabile and Gerald E. Mullen for Objectors and Respondents.

**OPINION**

**GATES, J.**—Eleanor Brown appeals from the judgment that admitted to probate the two documents we attach hereto as an appendix, thereby pre-

cluding her from inheriting her adoptive mother's estate which consisted of only the family residence valued by the inheritance tax referee at $32,500. ■ Although argued both here and below under many different headings, the one determinative question presented is:

"May a formal will inadmissible in probate because of the false declarations made by each of its purported witnesses, nonetheless be given effect by treating it as if the testatrix had intended it to be a holographic instrument?"

Appellant's testimony, which was unchallenged, established that though she and her mother had the same name they were not actually related, a fact appellant discovered only after her mother's death. It appears that appellant's mother and respondent Geraldine Nicholas, the mother's sister, were at least 78 years old at the time of the mother's death. Throughout her life the mother had led appellant to believe appellant was actually her granddaughter, whom the mother had adopted following the death of her own daughter.

Until early 1979, appellant had lived at home, attending school, working part time and caring for her mother. During the mother's extended illness appellant took her to visit her doctor "a couple of times a month." In mid-February of 1979, however, appellant, having obtained full-time employment, decided to move. A week or two prior thereto, appellant had met her aunt, the respondent, for the first time. Respondent resides in New Orleans, Louisiana and had come to California only for a visit.

Appellant's decision to live by herself offended her mother. Therefore, the mother composed the two documents that form the basis for this proceeding, although concededly not on January 1, 1979, the date shown on their face. The first, a formal will that failed to mention appellant, and the second, a "To Whom It May Concern" letter that expressed the mother's anger and purported to explain why the will read as it did.

Appellant further testified without contradiction or challenge that after respondent had returned to New Orleans, appellant's mother "apologized and we made up and that was the last I heard about it [her mother's initial displeasure] until after she died." During the remaining months of her mother's life appellant continued to care for her as she had done previously. That is to say, appellant would visit her mother every weekend, cash her social security check for her, purchase her groceries, etc., etc.

Appellant's mother died on December 12, 1979, and appellant's petition for letters of administration filed February 7, 1980, was granted. Four years

later, however, respondent objected to appellant's petition for distribution and on February 22, 1984, filed the subject instruments for probate.

Respondent did not testify at trial but the parties entered into a stipulation which provided that if she had been called she would have said that she saw appellant's mother "working on the documents" during her visit to Los Angeles and that appellant's mother "gave" them to her when she returned to New Orleans sometime in February.[1]

Respondent did not aver, however, that the mother had ever declared the testamentary instrument was her will, or that she intended it to be effective until the attestation clause she had prepared had been completed. Further, respondent did not assert that the mother appeared to be of sound mind and acting free of any form of undue influence at the time she decided to give all her small estate to respondent and even to have respondent's son act as her executor.

Most remarkable of all, perhaps, respondent did not explain when or how she came to complete the formal will by having three residents of New Orleans at some unknown date perjure themselves by falsely asserting that they had been witnesses to its execution by appellant's mother.

The parties argue at great length the many arcane points that would arise if the mother's incompleted formal will were to be transformed into a holographic one, e.g.: Could the mother's nontestamentary "To Whom It May Concern" letter be treated as a species of codicil, or by some theory such as integration or incorporation be stretched to defeat appellant's rights as a pretermitted heir? We need not consider such issues, however, for we conclude the will itself is invalid, per se.

"Our courts in California have gone a long, long way to carry into effect wishes of testators, despite informalities in holographic wills. Reference to our case law will disclose a considerable number of such instances. Undoubtedly the reason for this benevolent approach to the probate of holo-

---

[1] "It is hereby stipulated between the parties and their attorneys that if GERALDINE NICHOLAS were called and sworn to testify under penalty of perjury that she would say: [¶] 'Decedent began writing out the Documents on or about January 1979. She had not completed the writing of such documents until on or about the latter part of January or early part of February 1979 when decedent was visited by her sister, Geraldine Nicholas, Mrs. Nicholas' husband and Mrs. Nicholas' daughter. Decedent continued working on the documents during the time Mrs. Nicholas and her family were visiting. Mrs. Nicholas observed the decedent working on the documents. Mrs. Nicholas left her sister's residence to return to New Orleans in February 1979. At that time, the decedent gave Mrs. Nicholas the documents in the form as they now appear, except that the purported signatures of the witnesses on the will form document had not been affixed.' "

graphic wills has been the human desire of men for a time clothed with judicial power to comply with the wishes of those who have gone to Hamlet's 'undiscover'd country from whose bourn No traveller returns . . . .' " (*Estate of McNamara* (1953) 119 Cal.App.2d 744, 747 [260 P.2d 182].)

The current high-water mark in this effort to salvage a writing intended to be an immediately effective informal will was reached by the four-to-three majority decision in *Estate of Black* (1982) 30 Cal.3d 880 [181 Cal.Rptr. 222, 641 P.2d 754]. There a decedent, by striking virtually all the printed words on three 1-page will forms, drafted a document which she expressly intended and hoped would be given testamentary disposition without further formality. To thus salvage a will a testator clearly intended to be of the holographic variety is one thing; to convert a failed formal will into such an instrument is quite another.

As noted in Bird, *Sleight of Handwriting: The Holographic Will in California* (1981) 32 Hastings L.J. 605, 632: ". . . the formalities prescribed by the Statute of Frauds and subsequent Wills Acts are not mere formalism. They serve very basic and necessary purposes. If a document has been executed with the usual testamentary formalities, a court can be reasonably certain that it was actually executed by the decedent; that it was seriously intended as a will; what its contents are; and that the testator was free from at least immediate duress at the time of its execution. Only the first of these functions is served by the holographic wills statute, and even that not very effectively. Because the holographic form does not serve these other essential purposes, it leaves these matters open to doubt and hence to litigation."

Here, except for the most laconic stipulated statement of respondent, we have no evidence to establish how the subject documents even came into respondent's possession. On the other hand, from the face of the will itself it is clear that the testatrix anticipated there would be further formalities before it would become effective. Respondent obviously was aware of this fact for at some unspecified time and in some unknown manner she caused the will to be attested, albeit falsely, by three persons residing in New Orleans. However, at least insofar as revealed by the record, respondent never notified her sister that she had taken such action.

The dangers inherent in this scenario are manifest, not the least being that appellant's mother apparently never knew, following her reconciliation with her daughter, that it might be provident to "revoke" the formal will which previously had not been completed.

Of course, we are also conscious of the fact that the majority of the court in *Black* was at pains to point out that there "rejection of the instrument as

a will would have the unfortunate practical consequence of passing [the decedent's] estate through the laws of intestacy to the daughter of her pre-deceased husband by a former marriage—in fact, a stranger to her—thereby excluding those whom she described in the holograph as 'my very dear friends' and 'my adopted family' and the charity which was apparently close to her heart and which she specifically wished to benefit. The resulting frustration and defeat of her testamentary plan would be directly contrary to our *Baker* [59 Cal.2d 680 (31 Cal.Rptr. 33, 381 P.2d 913)] reasoning and would serve neither valid public policy nor common sense." (*Estate of Black, supra,* 30 Cal.3d 880, 888.)

In the present instance, exactly the converse result would occur if respondent's proffered documents were to be successfully converted from a formal will to a holograph. Rather than appellant, the natural heir and the one person who cared for the mother throughout her lifetime, receiving the mother's only asset, the family home, this residence would pass to a very elderly sister who lives in another state and who merely chanced to visit the mother during a brief period when the mother was upset because of her daughter's attempt to become more independent.

The order under review is reversed.

Roth, P. J., and Compton, J., concurred.

Respondents' petition for review by the Supreme Court was denied November 14, 1985.

APPENDIX

FEB 22 1984

**LAST WILL AND TESTAMENT**

FILED
19
CORCORAN, COUNTY CLERK
DEPUTY

I, Eleanor Mae Brown _____, a resident of
906 E. 82nd St. Los Angeles, California _____, California,

declare this to be my last Will and revoke all other Wills previously made by me:

FIRST: I declare I have never made a will before, and I declare that I am aware of what I am doing, I write in my own hand that which I want done in the disposal of my separate property after my demise.

2nd. I truly declare, bequeath and desire all my right title and interest in that certain parcel of property located at 906 East 82nd Street to my only sister Geraldine Nicholas my sister is the only person who is and will continue to help me in every way possible as long as I shall live. The said property that I give to my sister Geraldine Nicholas located in Los Angeles County legally described as lot 1262 of tract no 6097 as per map recorded in Book 68 pages 26 to 28 inclusive of maps in the office of the county recorder of said county, Los Angeles county.

3rd. I give bequeath and desire all my rights and interest in my house hold furnishing clothing and all that I own or have at the time of my demise to my sister Geraldine Nicholas

4th. If any one should contest this will I give, desire, bequeath the sum of one dollar ($1.00) to each of them
my sister Geraldine Nicholas reside at 1833 St Anthony Street New Orleans Louisiana. 70119
no changes are to be made for execution of this will

And: I appoint Julius A. Ford
1833 St Anthony street New Orleans, La. 70119
as Executor of this Will and Testament to execute same And to see that this will is executed in the manner as I have stated above

This Will was signed by me on the 1st day of January, 1929 at Los Angeles, California, _____, California.

Eleanor Mae Brown

THE FOREGOING INSTRUMENT was, on the date thereof, signed by the test. _____,
Eleanor Mae Brown _____, in our presence, we being present at the same time, and she then declared to us that the said instrument was her last Will; and we, at the request of said Eleanor Mae Brown _____, and in her presence, and in the presence of each other, have signed the same as witnesses. We further declare that at the time of signing this will the said Eleanor Mae Brown _____ appeared to be of sound and disposing mind and memory and not acting under duress, menace, fraud or the undue influence of any person whomsoever.

Julius A. Ford
Signature of Witness _____ residing at 1833 St Anthony St N.O. La 70119
Mrs Josie Rose
Signature of Witness _____ residing at 680 N. Halvey 70119
Ethel Doyle Otis
Signature of Witness _____ residing at 1228 Kentucky St. 70117

WILLS—WOLCOTTS FORM 1670
REVISED 12-49

This standard form covers most usual problems in the field indicated. Before you sign, read it, fill in all blanks, and make changes proper to your transaction. Consult a lawyer if you doubt the form's fitness for your purpose.

MABEL V. GRAY, I.G.H.P.
EXIE HOLLIS, C.G.M.
WALTER DRIVER, V.C.G.M.
LUTHERMAE ADAMS
Grand Endowment Secretary
MARY FIELDS
Grand Treasurer
HADLEY SIMMONS
Grand Recorder
ELEANOR M. BROWN, V.G.H.P.
906 East 82nd Street
Los Angeles, Calif. 90001
Phone: 585-9102
NANCY MORGAN, V.C.P.
MARCINE B. SHAW, Recorder
MARTHA KUHLMAN, Treasurer
ROSA HAYES, Convention Chariman
DEOLA B. WHITE, Co-chairman
MINNIE MAYFIELD, Ways & Means

777    *"In Solo Deo Salus"*    333

## Knights & Daughters of Tabor
### INTERNATIONAL ORDER OF TWELVE
*California - Arizona Jurisdiction*
NEW BEULAH TABERNACLE #2

Los Angeles, Calif.

January 1st, 1979

To whom it may concern. I have an adopted daughter. whom I have cared for from 5, days old up untill this present time she was born 1-9-51 in Los angelis, I have cared for her through the years she is an adult and has caused me much suffering. I taken ill on 2-6, 1976 and the above mentioned adopted chiled has been very cruel to me refused to help me in any way. accused me of puting on and not being ill, even though I have been and still at the above date am taking treatment at Kaiser hospital in Bell flower Calif. 9400 Rosecrans ave my Doctors are Dr c. Stulpul and Dr L. Hahn for congestive heart failure, Diabetes, arthritis High blood pressure, poor circulation and Bladder cancer. I have had 3, operations for same also Radium treatments, my adopted daughter never asked me how I filt or did anything to eliminate my suffering, lived free of charge here in my home, even though she is employed would not contribute to the expense of the home or my well being, and moved out leaving me unable to work to live alone, my sister came from New Orleans to assist me, therefore, I do not wish my adopted daughter to have any of my possessions except what I have given to her —